IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JOEL FEDOR, | ) | Case No. 1:21-CV-01125 |
| | ) | |
| Plaintiff, | ) | JUDGE SARA LIOI |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | REUBEN J. SHEPERD |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

## I.      Introduction

Plaintiff, Joel Fedor ("Fedor"), seeks judicial review of the final decision of the
Commissioner of Social Security, denying his application for disability insurance benefits
("DIB") under Title II of the Social Security Act. This matter is before me pursuant to 42 U.S.C.
§§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ")
applied proper legal standards and reached a decision supported by substantial evidence, I
recommend that the Commissioner's final decision denying Fedor's application for DIB be
affirmed.

## II.    Procedural History

Fedor protectively filed for DIB on March 21, 2019, alleging a disability onset date of January 1, 2016. (Tr. 212).[1] The claims were denied initially and on reconsideration. (Tr. 70-80, 121-40). He then requested a hearing before an ALJ. (Tr. 167). Fedor (represented by counsel) and a vocational expert ("VE") testified before the ALJ on September 4, 2020. (Tr. 28-69). On September 28, 2020, the ALJ issued a written decision finding Fedor not disabled. (Tr. 10-27). The Appeals Council denied his request for review on April 9, 2021. (Tr. 1-3).

Fedor then filed an appeal in this Court on June 4, 2021. (ECF Doc. 1). On October 1, 2021, the Commissioner filed an unopposed motion for remand under Sentence Six of 42 U.S.C. § 405(g) for irregularities in the hearing recording process. (ECF Doc. 7). On October 29, 2021, the District Judge granted the motion and ordered the matter remanded, with instruction to the Appeals Counsel to remand to an ALJ to hold another hearing and issue a new decision; the case was then administratively closed. (ECF Docs. 8, 9). The case in this Court was reopened on June 11, 2024. (ECF Doc. 11, non-document entry of June 11, 2024).

A new hearing before the ALJ was held on February 21, 2023. (Tr. 3745-80). The ALJ issued a written decision on March 3, 2023, again finding Fedor not disabled. (Tr. 3718-37). The Appeals Counsel declined jurisdiction on May 10, 2024, making the hearing decision the final decision of the Commissioner. (Tr. 3711-13; *see* 20 C.F.R. §§ 404.955, 404.981).

---

[1] The administrative transcript was filed in two parts, corresponding respectively to the ALJ's September 28, 2020 (ECF Doc. 14, Tr. 1-3710) and the March 3, 2023 hearing decisions (ECF Doc. 15, Tr. 3711-4988). This, however, does not affect this Court's convention and I continue to refer to the transcript number found at the bottom right hand of each page.

III.    **Evidence[2]**

A.    **Personal, Educational, and Vocational Evidence**

Fedor was 54 years old on the date last insured, making him an individual closely approaching advanced age according to Agency regulations. (*See* Tr. 3735). He had a high school education. (*See id*). Fedor had no past relevant work. (*Id.*).

B.    **Relevant Medical Evidence**

On January 27, 2015, Fedor met with John Shaffer, M.D., for a cortisone injection in his right shoulder. (Tr. 299). Dr. Shaffer noted a biceps tendon rupture, shoulder injury, superior glenoid labrum lesion, tendinitis of right shoulder, and wrist sprain. (*Id.*). On examination, Fedor had painful range of motion, impingement provocation, and full internal rotation increased his shoulder symptoms. (Tr. 300). Dr. Shaffer recommended that due to ongoing issues in his right shoulder, surgery was likely necessary. (Tr. 299). Fedor reported to Dr. Shaffer that he had been injured at work and was in the process of obtaining worker's compensation benefits to cover his medical care. (*Id.*). He requested, and Dr. Shaffer provided, the cortisone injection to provide temporary comfort. (*Id.*). Dr. Shaffer reaffirmed a previously recommended workup and appropriate referrals once Fedor's benefits were confirmed. (Tr. 300).

On March 1, 2015, Fedor presented to the emergency department for a heart attack. (Tr. 306). He reported he had had chest pain on February 23, 2015, including difficulty taking a deep breath and jaw pain. (Tr. 316). On March 3, 2015, Fedor met with Elizabeth Salay, M.D., for follow up after hospitalization for his myocardial infarction. (Tr. 304). Fedor reported severe,

---

[2] Although other evidence past the date last insured is available preceding the March 3, 2023 hearing decision (*see* ECF Doc. 15), I focus my review of the evidence to that pertinent to Fedor's claim, *i.e.*, evidence from his alleged onset date of January 1, 2016 through his date last insured of September 30, 2016.

crushing chest and chin pain; he was shocked and started on an amiodarone drip, but had no chest compressions. (*Id.*). He had a stent placed to his left circumflex artery by Michael Amalfitano, D.O. (*Id.*). Dr. Salay advised Fedor to quit smoking. (*Id.*). Fedor reported he had reduced his cigarette usage but was still vaping. (Tr. 304-05). Dr. Salay continued Fedor on lisinopril and Coreg for his elevated blood pressure and recommended follow up in two months. (Tr. 305).

On April 9, 2015, Fedor received a Toradol injection for pain. (Tr. 326-27). At follow up with Dr. Salay on April 10, 2015, Fedor reported that he was waking up with leg pain in the mornings after starting on an inhaler. (Tr. 321). He also reported the Coreg caused hypotension and was stopped by Dr. Miller. (*Id.*). He continued to reduce his cigarette use. (*Id.*). Dr. Salay assessed Fedor with lumbago, COPD with exacerbation, tobacco use disorder, depression with anxiety, and ST elevation myocardial infarction. (Tr. 321-22). Dr. Salay recommended Fedor trial Spiriva to treat his COPD. (Tr. 321).

On May 6, 2015, Fedor followed up with Dr. Salay for treatment of his COPD. (Tr. 328). He had trialed Spiriva but was unsure if he could afford the $30 monthly cost. (*Id.*). On examination, his lungs were tight with wheezing but he had regular cardiovascular rate and rhythm. (*Id.*). Dr. Salay recommended a pulmonary referral. (Tr. 329).

On August 18, 2015, Fedor followed up with Dr. Salay with continued complaints of excess sweating and shortness of breath but no new pain. (Tr. 335). He had seen his cardiologist two weeks earlier and was restarted on a blood thinner. (*Id.*). A stress test in April was non-

diagnostic. (*Id.*). Dr. Salay discussed side effects of his medication as a cause for sweating. (*Id.*). His COPD was noted as stable. (Tr. 336).

On October 9, 2015, Fedor attended a pain management appointment with Paul Shin, M.D. (Tr. 772). Dr. Shin reviewed Fedor's imaging studies and assessed Fedor with degenerative disc disease of the lumbar spine. (*Id.*). He recommended a diagnostic facet injection and if this course relieved Fedor's pain, he would consider radiofrequency ablation. (*Id.*).

On November 10, 2015, Fedor met with Dr. Salay complaining of cough and chills with increased shortness of breath. (Tr. 343). Dr. Salay started him on amoxicillin and prednisone. (*Id.*). Fedor reported that he was smoking less than before and was down to one pack every four days. (*Id.*). He started Plavix and declined nebulizer treatment. (Tr. 343-44). Dr. Salay instructed Fedor to keep his appointment with his pulmonologist that week and to go to the emergency room for worsening symptoms. (Tr. 344).

On December 2, 2015, Fedor presented to Dr. Shin at the Pain Management Center ("PMC") office for follow up regarding his chronic lower back pain. (Tr. 790). Fedor reported persistent symptoms since the last visit, and no improvement from the previous procedure. (*Id.*). Fedor reported his pain was 8/10. (*Id.*). Dr. Shin reviewed an MRI of the lumbar spine which demonstrated a diagnosis of osteoarthritis with unspecified complication status. (Tr. 792).

On January 13, 2016, Fedor met with Robert Castele, M.D. for pulmonary follow up. (Tr. 799). Dr. Castele noted Fedor had no wheezing and was in no acute distress, but his chest showed "markedly prolonged expiration as always." (*Id.*). Fedor complained of severe swelling in his right leg, which Dr. Castele identified as possible deep vein thrombosis ("DVT") of the right leg and advised Fedor to go to the emergency department for immediate evaluation. (*Id.*). Fedor declined to immediately go to the emergency department, against Dr. Castele's

recommendation. (*Id.*). Dr. Castele also assessed Fedor with significant COPD, but noted Fedor was not taking his bronchodilator and still smoked a pack of cigarettes a day. (*Id.*). Dr. Castele recommended Fedor be evaluated for DVT and advised he maintain compliance with his prescribed medications, with follow up in a month. (*Id.*).

Fedor later that day went to the emergency department for evaluation of possible DVT. (Tr. 808). He reported no discomfort at rest, only with ambulating. (*Id.*). There was notable swelling on his right leg upon examination, but no calf tenderness, no significant erythema, or warmth, and no lymphatic streaking. (Tr. 811). His pulses were intact and symmetrical to the left lower extremity, no cyanosis was noted, and he had normal capillary refill. (*Id.*). No right lower extremity DVT was identified. (*Id.*).

On January 28, 2016, Fedor followed up with Dr. Salay, complaining that he was still having trouble breathing but was not sweating as much. (Tr. 352). He still had to take a break climbing steps and felt wheezing in his throat. (*Id.*). He reported poor exercise tolerance with elevated maximum heart rate. (*Id.*). On examination, Fedor's color was improved but he appeared to have shortness of breath at rest, with tight lungs and wheezing at the level of the vocal cords; he had regular cardiovascular rate and rhythm. (*Id.*). Dr. Salay noted that Fedor was easily tachycardic and added Cardizem with instruction to have a blood pressure check in two weeks. (*Id.*). Fedor was on nighttime oxygen. (*Id.*).

Fedor underwent a sleep study. (Tr. 359-61). Results from February 4, 2016, indicate a diagnosis of severe obstructive sleep apnea associated with severe apparent hypoxia. (Tr. 360-61).

On April 12, 2016, Fedor followed up with Dr. Salay complaining of back pain, with swelling in his legs, knees, ankles, and back, and requesting pain management. (Tr. 362). On

examination, his lungs were severely tight and Dr. Salay noted he was not using his nebulizer. (*Id.*). Dr. Salay assessed Fedor with coronary artery disease, tobacco use disorder, chronic low back pain with sciatica, and emphysema. (Tr. 363). Dr. Salay recommended Fedor take pain medication as prescribed, encouraged use of his nebulizer, and recommended follow up with his pulmonologist. (*Id.*). Fedor followed up on October 12, 2016, for a six-month assessment of his shortness of breath. (Tr. 369). Fedor reported he was noncompliant with his medication and requested breathing medications. (*Id.*). Dr. Salay noted Fedor "asked multiple times for increase in his pain medication" during the visit, but she declined in favor of offering a referral to pain management, which Fedor refused. (*Id.*). Dr. Salay provided Fedor a Kenalog injection for pain. (Tr. 375).

On April 20, 2016, Fedor attended a pulmonary follow up appointment with Dr. Castele. (Tr. 822). Dr. Castele noted he had not seen Fedor for a few months, and he was not taking any of his COPD or cardiac medications. (*Id.*). Fedor was still smoking up to a pack of cigarettes per day and asked about Chantix for smoking cessation. (*Id.*). Dr. Castele advised against Chantix because of side effects from his other medications and recommended using a nicotine patch. (*Id.*). Dr. Castele re-prescribed ipratropium bromide and albuterol to use in his nebulizer, along with a nicotine patch. (*Id.*). In addition, Dr. Castele urged Fedor to contact his primary care physician and a cardiologist to restart his cardiac medications. (*Id.*). Dr. Castele recommended follow up in three months, noting that Fedor would not schedule an appointment sooner. (*Id.*).

On May 10, 2016, Fedor presented to urgent care complaining of coughing with yellow phlegm and requesting an antibiotic. (Tr. 829). Fedor reported he had been using his nebulizer every other hour but had not been using his rescue inhaler. (*Id.*). Fedor was recommended to go to the emergency department for treatment of his symptoms, but he refused for financial

7

concerns. (Tr. 831). Fedor was then given 60 mg of prednisone and a prescription for albuterol aerosol. (*Id.*). His pulse oxygen level remained at 94% on room air. (*Id.*). X-rays were positive for possible pneumonia and he was prescribed amoxicillin 500 mg for ten days with follow up in one week for reevaluation. (Tr. 832).

On July 13, 2016, Fedor reported to urgent care complaining of chronic right wrist pain with numbness and tingling. (Tr. 841). He reported that he had managed with cortisone injections, but the last injection was six years ago. (*Id.*). On examination, he had a positive Tinel's sign and positive decreased sensation median nerve wrist effusion. (Tr. 843). Fedor was assessed with chronic recurrent right carpal tunnel syndrome and supposed right shoulder impingement. (*Id.*). Notes from the visit indicated that Fedor was only interested in a cortisone injection, which was provided at Fedor's insistence, although it was a procedure not usually provided in that clinic. (*Id.*). Fedor returned on July 20, 2016, for a cortisone injection for his right shoulder impingement, which he tolerated well. (Tr. 849).

## C.    Medical Opinion Evidence

At the initial level on August 27, 2019, Maria Yapondijan-Alvarado, Psy.D., reviewed Fedor's file and could not assess his mental RFC due to insufficient evidence. (Tr. 76-77). Dr. Yapondijan-Alvarado stated Fedor did not return his ADL form. (Tr. 77). Aracelis Rivera, Psy.D., reviewed the record on January 17, 2020. (Tr. 116-18). She determined that Fedor could follow simple one- to two-step instructions in a work setting, carry out simple tasks, interact with coworkers, supervisors, and the public on a brief and superficial basis, and that he could adapt to a learned routine which does not have fast-paced production demands with infrequent changes in expectations. (*Id.*).

On August 29, 2019, state agency reviewing physician Sai Nimmagadda, M.D., determined that Fedor was capable of performing work at the light exertional level with additional limitations including frequent climbing of ramps/stairs, never climbing ladders/ropes/scaffolds, frequent balancing, stooping, kneeling, crouching, and crawling; unlimited reaching, handling, or feeling, but limited fingering; and avoiding pulmonary irritants or workplace hazards. (Tr. 77-79). Dr. Nimmagadda noted that while his medically determinable impairments including COPD and history of myocardial infarction were severe, Fedor could sustain full-time work with the above RFC. (Tr. 79). On December 28, 2019, at the reconsideration level, Steve E. McKee found the RFC at the initial level was accurate and affirmed Dr. Nimmagadda's findings. (Tr. 113-16).

On January 2, 2020, Fedor attended a consultative psychological examination with Joshua Magleby, Ph.D. (Tr. 3502-07). During the examination, Fedor described his mood as sad and stated that his symptoms of depression were "normal" to him. (Tr. 3503). He denied formal diagnosis or treatment. (*Id.*). On examination, he was alert and oriented to person, place, and time, but not necessarily situation. (Tr. 3504). His ability to understand simple direction during the examination appeared good, although his ability to understand more complex directions appeared average. (Tr. 3504-05). Dr. Magleby assessed Fedor as able to understand, remember, and carry out simple oral instructions; he had adequate ability to maintain attention, concentration, persistence, and pace at simple repetitive tasks, but was somewhat impaired in his ability to follow multi-step tasks; he also demonstrated some impairment in social interaction and in his ability to withstand the mental stress and pressures of day-to-day work. (Tr. 3506-07).

**D.      Administrative Hearing Evidence**

On February 21, 2023, Fedor testified at a hearing before the ALJ. (Tr. 3754). He

testified that in the relevant period in 2016, he lived in a house with his son. (*Id.*). He could

drive, but his son helped with other daily activities such as laundry, cooking, and cleaning. (Tr.

3754-55). Fedor described getting winded while grocery shopping. (Tr. 3756). He could stand

for a half hour before needing to sit. (Tr. 3760). He could not walk far and would use a riding

lawnmower because he could not use a push mower. (*Id.*).

Fedor had a severe heart attack in 2016. (Tr. 3758). He met with his cardiologists every

other month during that time, who advised him not to overexert himself. (Tr. 3758). He also had

trouble breathing. (Tr. 3759). He smoked about two packs per day in 2016 but was using patches

and got down to two to four cigarettes per day by the 2023 hearing. (*Id.*). He used nebulizers and

albuterol treatments to help his breathing. (*Id.*). The albuterol treatments were three or four times

per week. (Tr. 3760). He had previously received pain management for back pain, but lost

insurance coverage and failed to continue treatment. (Tr. 3757-58). After that, he attempted to

use Tylenol and ice packs without relief. (Tr. 3761). He attempted physical therapy for his back

pain, but he "didn't see the sense" in the stretching exercises provided during physical therapy.

(*Id.*). He had also received injections in his back. (Tr. 3769). Fedor stated that his doctors had

recommended against back surgery because it was too close to the nerves and could have

paralyzed him. (*Id.*).

Fedor also complained of pain in his right shoulder affecting his ability to wash his hair,

put on a t-shirt, or hold a gallon of milk. (Tr. 3761). He wore braces on each wrist and needed

injections in both hands. (Tr. 3762). He endorsed relief from the injections, but still had

problems dropping things or working zippers and buttons on clothing. (*Id.*). He had panic

attacks, which he described as a side effect of his medications. (Tr. 3763). He had a diagnosis of sleep apnea but did not use a CPAP; he would get about 6 hours sleep each night. (Tr. 3763-64).

He last worked in 2015, before his heart attack. (Tr. 3757). He had worked part-time before then, and also had periods of self-employment. (*Id.*).

The VE then testified. The ALJ provided the following hypothetical: an individual who could work at light exertion with additional limitations including never climb ladders, ropes, or scaffolds, occasionally climb ramps and stairs, occasionally stoop and crawl; frequently balance, kneel, and crouch; frequently push, pull, and reach with the right upper extremity, frequently handle and finger with the bilateral upper extremities; avoid concentrated exposure to extreme cold and heat, humidity, vibrations, and pulmonary irritants; avoid all exposure to hazards such as unprotected heights and moving mechanical parts; he could perform simple, routine, and repetitive tasks, but would not be able to perform tasks which required a high production rate pace such as assembly line work; he would make only simple work-related decisions and should not be responsible for the welfare or safety of others; he could interact on an occasional basis with supervisors and coworkers; he could have no more than incidental interaction with the general public; limited to superficial contact, including no sales, arbitration, negotiation, conflict resolution, or confrontation; no group, tandem, or collaborative tasks; and no management, direction, or persuasion of others; the individual could respond appropriately to occasional change in a routine work setting, but those changes would need to be easily explained and/or demonstrated in advance of gradual implementation. (Tr. 3772-73). The VE responded that the following jobs would be available in the national economy for an individual so limited: marker, DOT 209.587-034, SVP 2, light exertion, and 56,000 jobs in the national economy; garment sorter, DOT 222.687-014, SVP 2, light exertion, 23,000 jobs in the national economy; laundry

classifier, DOT 361.687-014, SVP 2, light exertion, and 21,000 jobs in the national economy. (Tr. 3773-74).

The ALJ then modified the first hypothetical to limit standing and walking to four hours in an eight-hour workday. (Tr. 3774). The VE testified that all the jobs previously identified could be performed with that limitation. (*Id.*). However, not all employers could accommodate sitting and standing, and, in the VE's experience, this would reduce the available jobs by fifty percent. (*Id.*). If the individual were limited to two hours of standing and walking in an eight-hour workday, the individual would be reduced to sedentary work instead of light work. (Tr. 3777).

The ALJ again modified the hypotheticals to reduce reaching with the right upper extremity from frequent to occasional. (Tr. 3774). The VE responded that such a limitation would eliminate any unskilled light jobs. (Tr. 3774-75). Similarly, a reduction in handling and fingering with the bilateral upper extremities from frequent to occasional would eliminate all occupations at the light level. (Tr. 3775). Finally, the ALJ described the first two hypotheticals and reduced social interaction to effectively isolation, but still permitted occasional interaction with supervisors but no interaction with coworkers or the general public. (*Id.*). The VE testified that he would not be able to find any occupations to accommodate such a restriction. (Tr. 3775-76).

The ALJ also noted that he would consider sedentary versions of all the same hypotheticals. (Tr. 3776).

In addition, the VE testified that employers will generally tolerate up to ten percent time off task and would tolerate up to one day absent per month, including coming in late or leaving early. (*Id.*). Anything more would be work preclusive. (*Id.*).

12

IV.     **The ALJ's Decision**

1.      The claimant last met the insured status requirements of the Social Security Act (the "Act") on September 30, 2016.

2.      The claimant did not engage in substantial gainful activity during the period from his alleged onset date of January 1, 2016, through his date last insured of September 30, 2016 (20 C.F.R. 404.1571 *et seq.*).

3.      Through the date last insured, the claimant had the following severe impairments: obesity, tendinitis/impingement syndrome of right shoulder, carpal tunnel syndrome- bilaterally, coronary artery disease/sinus tachycardia-elevated myocardial infarction/hypertension/hyperlipidemia [hereinafter, collectively, the "cardiac impairment"], lumbar spondylosis/ facet arthropathy/osteoarthritis of the lumbar spine/sciatica/radiculitis [hereinafter, collectively, the "spine impairment"], chronic obstructive pulmonary disease/emphysema, Buerger's disease, depression and anxiety. (20 C.F.R. 404.1520(c)).

4.      Through the date last insured, the claimant did not have an impairment or combination of impairments that met or medically equaled the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. 404.1520(d), 404.1525 and 404.1526).

5.      After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as defined in 20 C.F.R. 404.1567(b) except that the claimant may frequently balance, kneel, crouch, may occasionally stoop, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant may frequently push/pull and reach with the right upper extremity; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant must avoid concentrated exposure to humidity, vibration, extremes of heat and cold, and pulmonary irritants, such as dust, odors, gases, fumes and poor ventilation; the claimant must avoid all exposure to unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks and to the making of no more than simple, work-related decisions, conducted in a work setting with no high production-rate pace [as is found in assembly line work], which setting confers no responsibility upon the claimant for the safety or welfare of others, which setting requires no more than incidental and superficial [defined as precluding group, tandem, or collaborative tasks, as well as tasks involving sales, arbitration, negotiation, confrontation, conflict resolution, the management of, direction of, or persuasion of, others] interaction with the public and no more than occasional and superficial interaction with co-workers and supervisors, which setting is routine, in that it contemplates no more than occasional changes, easily explained and/or demonstrated in advance of gradual implementation.

6.      The claimant has no past relevant work (20 C.F.R. 404.1565).

7.      The claimant was born on July 16, 1962 and was 54 years old, which is defined as an individual closely approaching advanced age, on the date last insured (20 C.F.R. 404.1563).

8.      The claimant has at least a high school education (20 C.F.R. 404.1564).

9.      Transferability of job skills is not an issue because the claimant does not have past relevant work (20 C.F.R. 404.1568).

10.     Through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, there were jobs that existed in significant numbers in the national economy that the claimant could have performed (20 C.F.R. 404.1569 and 404.1569a).

11.     The claimant was not under a disability, as defined in the Social Security Act, at any time from January 1, 2016, the alleged onset date, through September 30, 2016, the date last insured (20 C.F.R. 404.1520(g)).

(Tr. 3723-37).

## V.      Law & Analysis

### A.      Standard for Disability

Social Security regulations outline a five-step process the ALJ must use to determine

whether a claimant is entitled to benefits:

1.      whether the claimant is engaged in substantial gainful activity;

2.      if not, whether the claimant has a severe impairment or combination of impairments;

3.      if so, whether that impairment, or combination of impairments, meets or equals any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1;

4.      if not, whether the claimant can perform their past relevant work in light of his RFC; and

5.      if not, whether, based on the claimant's age, education, and work experience, they can perform other work found in the national economy.

20 C.F.R. § 404.1520(a)(4)(i)-(v); *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 642-43 (6th Cir.

2006). The Commissioner is obligated to produce evidence at Step Five, but the claimant bears

the ultimate burden to produce sufficient evidence to prove they are disabled and thus entitled to benefits. 20 C.F.R. § 404.1512(a).

## B.    Standard of Review

This Court reviews the Commissioner's final decision to determine whether it is supported by substantial evidence and whether proper legal standards were applied. 42 U.S.C. § 405(g); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). However, the substantial evidence standard is not a high threshold for sufficiency. *Biestek v. Berryhill*, 587 U.S. 97, 103 (2019). "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id.* quoting *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938). Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision cannot be overturned "so long as substantial evidence also supports the conclusion reached by the ALJ." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003).

Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence. *Id.* at 476. And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets the substantial evidence standard. *Rogers*, 486 F.3d at 241. This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without court interference. *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless. *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v.*

15

*Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error."). Furthermore, this Court will not uphold a decision when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result." *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011). Requiring an accurate and logical bridge ensures that a claimant and the reviewing court will understand the ALJ's reasoning, because "[i]f relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked." *Shrader v. Astrue*, No. 11-13000, 2012 WL 5383120, at *6 (E.D. Mich. Nov. 1, 2012); *see also Bowen v. Comm'r of Soc. Sec.,* 478 F.3d 742, 749 (6th Cir. 2007).

**VI.     Discussion**

Fedor brings one issue for this Court's review: whether the ALJ erred by failing to support his RFC determination with substantial evidence and thereby failing to find Fedor disabled as of his date last insured. (ECF Doc. 17, p. 1). Fedor argues that substantial evidence does not support the ALJ's finding that he could perform work at the light level of exertion, and that his impairments establish a need for sedentary work. (*Id.* at pp. 8-9). This proves central to Fedor's claim, because if he were "limited to the sedentary level of exertion, Appendix 2 to Subpart P of Part 404, Rule 201.12 would require a finding of disabled as [he] was over 50 years of age at all relevant times and had no past relevant work." (*Id.* at pp. 9-10). Fedor then reviews the medical evidence and concludes that, because the VE responded that certain hypotheticals would result in an inability to maintain competitive employment, he must be limited to sedentary work – and thereby be deemed disabled. (*Id.* at pp. 10-13).

The Commissioner argues that the ALJ provided substantial evidence to support his finding that Fedor could perform a range of light work. (ECF Doc. 19, p. 5). As the

Commissioner points out, the ALJ provided substantial evidence from the medical record to support his RFC findings. (*Id.* at pp. 5-8). In such circumstances, the Commissioner asserts, it is not for a reviewing court to second-guess. (*Id.* at p. 8).

I agree with the Commissioner's view. Although Fedor has provided a significant review of the medical record and wide-ranging reasons why the ALJ may have erred, I determine that, at bottom, the result is a request for me to re-weigh the evidence. Fedor has not uncovered reversible error, and for the reasons that follow, I recommend the District Court affirm.

Fedor's brief provides generalized arguments as to how the ALJ may have erred in his determination of disability. (*See generally* ECF Doc. 17). The issue he appears to be raising most succinctly lies with the ALJ's RFC determination that Fedor could perform light work. While he offers a litany of medical findings purporting to support an RFC at the sedentary level, and notes this in the context of available VE testimony indicating that certain sedentary hypotheticals would be disabling, this sill amounts to an invitation to re-weigh the evidence. (*See* ECF Doc. 17). Such an exercise is beyond this Court's purview.

Before proceeding to Step Four of the sequential analysis, the ALJ determines a claimant's RFC by considering all relevant medical and other evidence. 20 C.F.R. § 404.1520(e). The RFC is an assessment of a claimant's ability to work despite his impairments. *Walton v. Astrue*, 773 F. Supp. 2d 742, 747 (N.D. Ohio 2011) citing 20 C.F.R. § 404.1545(a)(1) and SSR 96-8p. "In assessing RFC, the [ALJ] must consider limitations and restrictions imposed by all of an individual's impairments, even those that are not 'severe.'" SSR 96-8p, 61 Fed. Reg. 34474, 34475 (1996). Relevant evidence includes a claimant's medical history, medical signs, laboratory findings, and statements about how the symptoms affect the claimant. 20 C.F.R. § 404.1529(a); *see also* SSR 96-8p.

At Step Four, the claimant has the burden to establish that he is unable to perform his past relevant work in light of his RFC. 20 C.F.R. § 404.1520(a)(4)(iv); *see also Wright-Hines v. Comm'r of Soc. Sec.*, 597 F.3d 392, 396 (6th Cir. 2010). But at the final step of the sequential analysis, the burden shifts to the Commissioner to produce evidence for whether the claimant can perform a significant number of jobs in the national economy. *Howard v. Comm'r of Soc. Sec.*, 276 F.3d 235, 238 (6th Cir. 2002); 20 C.F.R. § 404.1520(a)(4)(v). An ALJ may determine that a claimant can adjust to other work in the national economy by relying on a vocational expert's testimony that the claimant can perform specific jobs. *Howard*, 276 F.3d at 238. A vocational expert's testimony in response to a hypothetical question is substantial evidence when the question accurately portrays the claimant's RFC and other vocational characteristics. *See id.*; *see also Lee v. Comm'r of Soc. Sec.*, 529 F. App'x 706, 715 (6th Cir. 2013) (the ALJ's hypothetical question must "accurately portray[] a claimant's vocational abilities and limitations"). Nonetheless, "[a]n ALJ is only required to incorporate into a hypothetical question those limitations he finds credible." *Lee*, 529 F. App'x at 715; s*ee also Blacha v. Sec'y of Health & Hum. Servs.*, 927 F.2d 228, 231 (6th Cir. 1990) ("If the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints."). And it is up to the ALJ to resolve conflicts in the record to determine the RFC and disability adjudication, including any conflict posed by the VE's testimony. *See, e.g.*, *Lindsley v. Comm'r of Soc. Sec.*, 560 F.3d 601, 605-06 (6th Cir. 2009); *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997) (internal quotations omitted); *see also* SSR 00-4p, 2000 WL 1898704, at *4 (explaining that it is for the ALJ to resolve conflicts in VE testimony and explain their reasoning).

The ALJ determined that Fedor had the following RFC:

After careful consideration of the entire record, I find that, through the date last insured, the claimant had the residual functional capacity to perform light work as

defined in 20 C.F.R. 404.1567(b) except that the claimant may frequently balance, kneel, crouch, may occasionally stoop, crawl, climb ramps and stairs, but may never climb ladders, ropes, or scaffolds; the claimant may frequently push/pull and reach with the right upper extremity; the claimant may frequently handle and finger with the bilateral upper extremities; the claimant must avoid concentrated exposure to humidity, vibration, extremes of heat and cold, and pulmonary irritants, such as dust, odors, gases, fumes and poor ventilation; the claimant must avoid all exposure to unprotected heights and moving mechanical parts; the claimant is limited to the performance of simple, routine, repetitive tasks and to the making of no more than simple, work-related decisions, conducted in a work setting with no high production-rate pace [as is found in assembly line work], which setting confers no responsibility upon the claimant for the safety or welfare of others, which setting requires no more than incidental and superficial [defined as precluding group, tandem, or collaborative tasks, as well as tasks involving sales, arbitration, negotiation, confrontation, conflict resolution, the management of, direction of, or persuasion of, others] interaction with the public and no more than occasional and superficial interaction with co-workers and supervisors, which setting is routine, in that it contemplates no more than occasional changes, easily explained and/or demonstrated in advance of gradual implementation.

(Tr. 3727). In support of this RFC, the ALJ reviewed the evidence both supportive of and against

a finding of disability and provided reasoning relevant to his decision. (*See* Tr. 3727-35). For

example, the ALJ stated:

The claimant has described low back pain, chest pain, shortness of breath, pain, numbness and tingling in the wrist, and poor circulation, along with anxiety causing panic attacks, all imposing significant, work-related limitations [hearing testimony].
. . .
In terms of the claimant's alleged spine disorder, all diagnoses appear in the record without benefit of radiographic/imaging studies. The most recent is reported to date to 2010 and is reported only at second-hand. While these findings would be consistent with the claimant's allegations of low back pain, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.
. . .
Referral to an updated imaging study was made in December 2015 but declined by his insurance company for want of documentation of four-to-six weeks of physical therapy. Such a referral was made, but the evidence does not indicate compliance.
. . .
In terms of the claimant's alleged respiratory impairment, the claimant was diagnosed with chronic obstructive pulmonary disease on April 19, 2015 and with emphysema on April 12, 2016 . . .. While these findings would be consistent with the claimant's allegations of shortness of breath, the record, when considered as a

whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

. . .

Pulmonary function testing, dated May 6, 2015, indicated a severe obstructive ventilatory defect but read as resulting in a moderate obstructive impairment, with significant improvement after a bronchodilator.

. . .

Regrettably, the claimant has a lengthy and persistent history of non-compliance with his medications, including his respiratory medications.

Despite the widespread knowledge of the ill effects of the behavior on any pulmonary-related impairment, the claimant has remained a daily cigarette smoker throughout the period relevant to this claim.

. . .

In terms of the claimant's alleged cardiac impairment, the claimant's coronary artery disease was emergently diagnosed, in February 2015. Following catheterization of the left circumflex artery, TIMI flow was improved to grade III, with 0% residual stenosis. A fifty percent stenosis of the left anterior descending artery was left to be treated medically. . . . While these findings would be consistent with the claimant's allegations of chest pain, the record, when considered as a whole, is not supportive of the contention that the existence of this impairment would be preclusive of all types of work.

. . .

The claimant is prescribed multiple prescription medications intended to address this impairment, both indirectly [such as anti-hypertensive and anti-lipid medications] and directly [such as nitroglycerin], used without indication of side effects.

Regrettably, the claimant has a lengthy and persistent history of non-compliance with his medications, including his cardiology medications, office visits and treatment recommendations, including cardiac rehabilitation training.

. . .

In sum, the evidence would indicate that the symptom limitations relevant to these impairments are not as severe as alleged. If restricted to the performance of work at the light exertional level, where the claimant would frequently balance, kneel, crouch, would occasionally stoop, crawl, climb ramps and stairs, but never climb ladders, ropes, or scaffolds; where the claimant would frequently push/pull and reach with the right upper extremity; where the claimant would frequently handle and finger with the bilateral upper extremities; where the claimant would avoid concentrated exposure to humidity, vibration, extremes of heat and cold, and pulmonary irritants, such as dust, odors, gases, fumes and poor ventilation; and, where the claimant would avoid all exposure to unprotected heights and moving mechanical parts, adequate allowance will have been made for these impairments.

(Tr. 3727-32) (internal citations omitted). Ultimately, the ALJ determined the RFC was

appropriate:

> Based on the foregoing, I find the claimant has the above residual functional capacity assessment, which is supported by the totality of the evidence, including the medical evidence of record and the opinion evidence as outlined above, with due consideration afforded the subjective allegations of the claimant.

(Tr. 3735). This reasoning appropriately follows agency regulations and provides sufficient

analysis; my review confirms the ALJ provided substantial evidence in support.

As for the VE's testimony, the ALJ appropriately analyzed the VE's testimony

and resolved any conflict to determine there were representative jobs available in the

economy despite a lack of past relevant work. (Tr. 3735-36). The ALJ explained:

> Although the vocational expert's testimony is inconsistent with the information contained in the Dictionary of Occupational Titles, there is a reasonable explanation for the discrepancy. Testimony regarding the particulars of exertional and manipulative limitations directed to a single extremity, specifics of social interaction, the frequency of workplace change, and the means of implementation, supplemented the Dictionary of Occupational Titles with the professional experience and expertise of the vocational expert.

> Based on the testimony of the vocational expert, I conclude that, through the date last insured, considering the claimant's age, education, work experience, and residual functional capacity, the claimant was capable of making a successful adjustment to other work that existed in significant numbers in the national economy.

(Tr. 3736). Namely, the ALJ determined that Fedor retained the residual functional capacity to

perform the work of representative occupations to include marker, sorter, and classifier. (*Id.*).

Again, the ALJ's analysis is appropriate and consistent with the regulations. *See, e.g.*, *Lindsley*,

560 F.3d at 605-06. I find no reversible error on which to recommend remand.

Fedor's argument to the contrary is broad and sweeping and provides little direction to

his analysis of the ALJ's reasoning. He does no more to support his position than provide a

review of the medical record to demonstrate the evidence he believes should be disabling. This is

insufficient, and in essence, is an improper request for this Court to reweigh the evidence. "If the

[Commissioner]'s decision is supported by substantial evidence, it must be affirmed even if the

reviewing court would decide the matter differently . . . and even if substantial evidence also

supports the opposite conclusion." *Cutlip v. Sec'y of Health & Hum. Servs.*, 25 F.3d 284, 286

(6th Cir. 1994) (internal quotations omitted). I decline to engage with Fedor's line of reasoning

and must recommend the District Court affirm.

## VII.    Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by

substantial evidence, I recommend that the Commissioner's final decision denying Fedor's

application for disability insurance benefits be affirmed.

Dated: January 17, 2025

Reuben J. Sheperd
United States Magistrate Judge

_____

## OBJECTIONS

### Objections, Review, and Appeal

Within 14 days after being served with a copy of this report and recommendation, a party
may serve and file specific written objections to the proposed findings and recommendations of
the magistrate judge. Rule 72(b)(2), Federal Rules of Civil Procedure; *see also* 28
U.S.C.§ 636(b)(1); Local Rule 72.3(b). Properly asserted objections shall be reviewed de novo
by the assigned district judge.

* * *

Failure to file objections within the specified time may result in the forfeiture or waiver
of the right to raise the issue on appeal either to the district judge or in a subsequent appeal to the
United States Court of Appeals, depending on how or whether the party responds to the report
and recommendation. *Berkshire v. Dahl*, 928 F.3d 520, 530 (6th Cir. 2019). Objections must be

specific and not merely indicate a general objection to the entire report and recommendation; "a general objection has the same effect as would a failure to object." *Howard v. Sec'y of Health and Hum. Servs.*, 932 F.2d 505, 509 (6th Cir. 1991). Objections should focus on specific concerns and not merely restate the arguments in briefs submitted to the magistrate judge. "A reexamination of the exact same argument that was presented to the Magistrate Judge without specific objections 'wastes judicial resources rather than saving them, and runs contrary to the purpose of the Magistrates Act.'" *Overholt v. Green*, No. 1:17-CV-00186, 2018 WL 3018175, *2 (W.D. Ky. June 15, 2018) quoting *Howard*. The failure to assert specific objections may in rare cases be excused in the interest of justice. *See United States v. Wandahsega*, 924 F.3d 868, 878-79 (6th Cir. 2019).